# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RANDALL BLUE,**

                Plaintiff,

       **-vs-**                            **Case No. 13-CV-1439**

**WARDEN MICHAEL BAENEN,**
**CATHY FRANCOIS,**
**YANA PUSICH, and**
**DR. MARY SAUVEY,**

                Defendants.

---

# DECISION AND ORDER

---

The *pro se* plaintiff, Randall Blue, is a Wisconsin state prisoner. He filed this lawsuit under 42 U.S.C. § 1983. Blue alleges that defendants Warden Michael Baenen, Cathy Francois, and Captain Yana Pusich were deliberately indifferent to his safety because they did not give him a sturdy chair to access his top bunk bed, and that he fell and injured himself using the non-sturdy chair they did provide. Blue also claims that defendant Dr. Mary Sauvey was deliberately indifferent in that she withheld medical treatment after the fall. The defendants have filed a motion for summary judgment. For the reasons explained in this order, the Court will grant the defendants' motion and dismiss this case.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that

- 2 -

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## FACTS[1]

Blue was an inmate at Green Bay Correctional Institution (GBCI) at all times relevant to this lawsuit. (ECF No. 87 ¶ 1.) The defendants were employees at GBCI during that time. Michael Baenen was the warden; Cathy Francois was the institution complaint examiner; Yana Pusich is a captain; and Dr. Mary Sauvey is the institution physician. (*Id.* ¶¶ 3-6.)

### A. Blue's Complaints about Bunk Beds

Most of the cells at GBCI are double cells, meaning there are two inmates housed in one cell. All double cells are equipped with a metal frame bunk bed. (*Id.* ¶ 10.) There are 168 bunk beds in use at GBCI. (*Id.* ¶ 11.) The bunk beds have a metal frame that is 4' 5" tall, 6' 9" long, and 2' 9" wide. Inmates in double cells are assigned to the top or bottom bunk. Blue is 6' 1" tall. (*Id.* ¶ 12.)

There is no official procedure/process that dictates how an inmate gets up and down from the top bunk. (*Id.* ¶ 13.) In Pusich's experience,

---

[1] Facts are taken from the Defendants' Proposed Findings of Fact and the Plaintiff's Response to the Defendants' Proposed Findings of Fact. Facts are included in this section only the extent that they comply with Federal Rule of Civil Procedure 56(c) and Civil Local Rule 56(b) (E.D. Wis.).

based on her observations while working, most inmates get up onto the top bunk by stepping on the metal frame for the lower bunk, and then pulling themselves up onto the top bunk. (*Id.*) Similarly, inmates get down by lowering themselves from the top bunk until they step onto the metal frame for the lower bunk, and then lowering themselves from there to the floor. (*Id.* ¶ 13.) Pusich does not recall ever witnessing an inmate have difficulty getting up onto the top bunk, or down from the top bunk. (*Id.* ¶ 14.) Based on Pusich's observations, inmates at GBCI are able to safely get up and down from the top bunk without difficulty. (*Id.*)

Occasionally, Pusich has had inmates complain to her that they are unable to get up or down from a top bunk due to physical problems or limitations. (*Id.* ¶ 15.) For example, inmates have complained to Pusich that they could not be assigned a top bunk due to back problems, leg issues, and obesity. (*Id.*) When inmates make this complaint, Pusich directs them to contact the Health Services Unit (HSU) to request a low bunk restriction, which would guarantee them a low bunk assignment. (*Id.*) Per institution policy, all housing restrictions resulting from a medical issue go through the HSU and the institution's special needs committee. (*Id.*)

Depending on availability, GBCI provides inmates a chair for use in

- 4 -

their cell. (*Id.* ¶ 16.) GBCI has a limited supply of chairs, so not every single cell, or cell with one inmate assigned, has a chair. (*Id.*) All double cells do have a chair. (*Id.*) The chairs are not provided for inmates to use to climb into and down from top bunk beds. (*Id.* ¶ 17.) Chairs are provided to inmates in double cells as a courtesy so both inmates in the cell have a place to sit at ground level for activities like writing, watching television, and conversing. (*Id.* ¶ 18.)

All inmates at GBCI are provided with a copy of the institution's inmate handbook. (*Id.* ¶ 7.) The handbook includes a problem solving guide, which provides a process inmates are to follow to resolve everyday problems. (*Id.* ¶ 8.) It directs inmates to follow the chain of command to resolve their problems, and provides a detailed list of who they should contact for specific issues. (*Id.*) The handbook also directs inmates to first attempt to resolve their problem by contacting the staff member listed in the problem solving guide before filing an inmate complaint. (*Id.* ¶ 9.) For housing unit repairs, or other issues, inmates are directed to first contact their unit sergeant, then contact a security supervisor if the problem is not resolved. (*Id.*)

On July 22, 2013, Francois received a complaint from Blue that stated:

- 5 -

On 7-19-13, I was getting off the top bunk at 9:00 PM count I use the chair to get down because there's no other way to climb down from the top bunk, I step on the chair and it slip from under me, if it wasn't for my cellmate being there to catch me, I'm sure I would of fell and hurt myself seriously, this is not the first time I've slip, Officer Lenz was doing security check on A-tier in the north cell, I informed her that I slipped getting off the top bunk, I told her I need a sturdy chair to climb down on, and to get on the top bunk, truthfully there's no (safe) way to climb up and down the top bunk, I do fear hurting myself, especially in the middle of the night when it's totally dark, these bunks need a ladder of some type, like I said, this is a very very dangerous set-up not having a (safe) way to climb up and down the top bunk hope you don't reject this complaint, I'm making you aware of the dangerous situation I'm in.

(*Id.* ¶ 19.)

That same day, Francois sent Blue a letter returning his complaint materials and directing him to first attempt to resolve the issue by contacting Captain Pusich. (*Id.* ¶ 20.) Francois's letter stated in part:

Please inform Capt. Pusich that you were instructed to contact her by the ICE regarding needing a sturdy chair you can use to get on and off the top bunk, so that you do not slip and hurt yourself. You are also encouraged to contact HSU if you feel you need to be placed on a lower bunk restriction. You should submit this copy of your return letter along with your request to her. If you feel that she does not address the issue to your satisfaction, you may resubmit your complaint. When resubmitting your complaint, include any correspondence to and/or from Capt. Pusich and this letter.

. . .

To Capt. Pusich from ICE:

- 6 -

> 1) please document, date and sign this letter, your response taken on this issue;
> 2) return this document to inmate Randall Blue #188858.

(*Id.*)

Wis. Admin. Code § DOC 310.09(4) authorizes institution complaint examiners to direct an inmate to first try to resolve a submitted complaint with staff before accepting the complaint. (*Id.* ¶ 21.) As an ICE, Francois would regularly do this. (*Id.*) She did so because unit staff is usually in a better position to address the inmate's complaint and resolve any issue quickly. (*Id.*) Further, if the inmate is unhappy with staff's response to his issue and refiles his complaint, staff's written response would provide her a better understanding of the issue. (*Id.*) She also directed inmates to try to resolve the issue because doing so helps the inmate's rehabilitation, and fosters a better correctional environment. (*Id.*) Asking inmates to attempt to resolve their issues with staff helps the inmate develop problem-solving skills and promotes better relationships between inmates and staff. (*Id.*)

On July 25, 2013, Blue re-submitted the exact same offender complaint Francois returned, without first trying to resolve the issue with Capt. Pusich. (*Id.* ¶¶ 25-26.) Francois processed the complaint and made a recommendation that it be dismissed stating:

- 7 -

> Inmate Blue complains that he needs a sturdy chair in his cell so he can climb up to bunk. He states that when he tried to climb up to his bunk on 07/19/13 using the chair in his cell he slipped, because it is not sturdy enough.
>
> Inmate Blue was instructed to contact Capt. Pusich in an attempt to informally resolve this issue on 07/22/13, when the complaint was originally received in the ICE office and returned to him. He fails to indicate anywhere in his complaint that he did so. There is no administrative requirement that a chair be provided to inmates. That being said, this issue could be resolved by contacting Capt. Pusich, who can determine the true need. If Blue has medical issues that require him to have a lower bunk he should contact HSU.

(*Id.* ¶ 27.) Warden Baenen adopted Francois's recommendation and dismissed the complaint. (*Id.* ¶ 31.)

Neither Francois nor Warden Baenen believed that being on the top bunk posed any risk to Blue. (*Id.* ¶¶ 32-33.) Both believed, based on their observations, that inmates at GBCI are able to safely get up and down from the top bunk without difficulty using the bunk frame. (*Id.*)

On July 30, 2015, Blue wrote Captain Pusich an interview/information request regarding the chair in his cell. (*Id.* ¶ 36.) His request states:

> Capt. Pusich, I'm writing to you because I filed a complaint about me slipping on the chair climbing down from my top bunk, as you know there's no safe way of climbing up & down in the top bunk, I'm asking for a sturdy chair the ICE people dismissed my complaint because I hadn't contact you.

- 8 -

(*Id.*)  Pusich responded by stating, "You can address this with NCH [North Cell Hall] staff. Chairs are limited."  (*Id.*)

Pusich advised Blue to address the issue with North Cell Hall staff because complaints regarding housing unit issues should first be raised with cell hall staff, specifically, the unit sergeant.  (*Id.* ¶ 37.)  She also referred Blue to cell hall staff because they were in the best position to address any problems.  (*Id.*)  Pusich's expectation was that cell hall staff would appropriately address Blue's concerns.  (*Id.* ¶ 38.)  If his chair needed maintenance, Pusich expects that cell hall staff would have put in a work order.  (*Id.*)  If the chair was broken beyond repair, Pusich expects that staff would have removed the chair from the cell and replaced it with one of appropriate condition. (*Id.*)

Pusich does not believe Blue's claim that there is no safe way for inmates to get up and down from the top bunk is true.  (*Id.* ¶ 39.)  In Pusich's experience, inmates get up and down from top bunks at GBCI without the assistance of chairs safely and without difficulty.  (*Id.*)  Pusich does not believe that Blue being assigned to a top bunk posed any risk to his safety or well-being.  (*Id.* ¶ 40.)

## B.    Blue's Reported Fall from his Bunk Bed

On August 6, 2013, Blue's cellmate reported to staff that Blue fell off

- 9 -

the chair in the cell trying to get down from the top bunk. (*Id.* ¶ 41.) The cellmate reported that he did not witness the fall, but had heard a loud thud and then saw Blue lying on the floor. (*Id.*) Staff found Blue lying on the floor at the foot of the cell bunk. (*Id.*) When health care staff arrived, Blue was uncooperative with assessment, and would only answer a few questions. (*Id.* ¶ 59.) He stated that he fell while getting down from the top bunk and landed on his head. (*Id.*) An ambulance was called to take Blue to St. Vincent Hospital for further evaluation. (*Id.*)

When examined at St. Vincent Hospital, Blue denied hitting his head, and complained of some pain in the back of his neck, as well as his lower back. (*Id.* ¶ 60.) On examination, hospital staff noted that Blue was not in any acute distress, no deformities or abrasions were noted, but there was some tenderness in his lower lumbar spine. (*Id.*) X-rays and CT scan of Blue's spine showed a normal spine for his age, with no evidence of fracture, subluxation, or other acute abnormalities. (*Id.* ¶¶ 61-62.) The image for the x-ray was slightly limited because Blue was unwilling to move his restraints to help with the procedure. (*Id.* ¶ 61.) Hospital staff's final impression was that Blue had neck and low back strain post fall. (*Id.*) They recommended that he take Tylenol or ibuprofen for pain. (*Id.*)

Blue was seen by a nurse from the HSU when he returned from the

emergency room.  (*Id.* ¶ 63.)  He ambulated without obvious problem, easily moved, and readily put on his socks and slippers without hesitancy or indication of pain.  (*Id.*)  He stated that he wanted to go to work in the kitchen that day and had no problems being active, saying "play ball – do it all."  (*Id.*)  Blue did not request to see a physician, and based on his presentation, nursing staff did not independently schedule him to see one. (*Id.*) He was instructed to follow up as needed. (*Id.*)

Blue has a history of chronic back pain that predates his alleged fall on August 6, 2013.  (*Id.* ¶ 49.)  When Blue was seen by a nurse practitioner upon entering the DOC on January 13, 2010, he complained of a history of chronic low back pain and asked for a low bunk restriction.  (*Id.* ¶ 50.)  The nurse practitioner denied his request, noting that he was able to play basketball and lift weights at recreation.  (*Id.*)  Prior to August 6, 2013, Blue was regularly seen by doctors and nurses for his complaints of low back pain. (*See e.g., Id.* ¶¶ 51-58.)  He reported that his back pain dates back to an injury he sustained playing basketball in 1999.  (*Id.* ¶ 54.) Physical evaluations and x-rays of Blue's back were normal, showing no apparent injury.  (*Id.* ¶¶ 53-57.)  He was given pain relief medications and physical therapy, where he was taught a home exercise program to improve his pain.  (*Id.* ¶¶ 51-54, 56-57.)  Despite his complaints of chronic back

- 11 -

pain, Blue continued playing basketball during this time. (*Id.* ¶¶ 54-55, 58.)

## C.  Dr. Sauvey's Medical Care of Blue

Dr. Sauvey first saw Blue on September 5, 2013. (*Id.* ¶ 67.) At the time, she was not the regular physician of GBCI, but was covering appointments for the regular physician. (*Id.*) Blue complained of coccygeal, or tailbone, pain that began after his fall on August 6, 2013. (*Id.*) Dr. Sauvey examined Blue and found that he had full range of motion, but his back was tender along the tailbone. (*Id.*) She prescribed a trial donut for Blue to use while sitting for one month and muscle rub as needed. (*Id.*) Tailbone injuries may be slow to heal, but a majority of them can be managed conservatively. (*Id.* ¶ 68.)

Dr. Sauvey took over as the regular physician at GBCI on October 6, 2013. (*Id.* ¶ 6.) As the regular physician, Dr. Sauvey does not schedule inmates for initial or follow-up appointments. (*Id.* ¶ 47.) Doctor's appointments are scheduled by nursing staff, who respond to inmates written medical requests, and screen patients at sick call. (*Id.* ¶¶ 43-46.)

On November 19, 2013, Dr. Sauvey saw Blue again for his ongoing tailbone pain. (*Id.* ¶ 71.) Blue indicated that he was using the donut and pain medication, and was able to play basketball comfortably. (*Id.*) On

- 12 -

exam, he had some tenderness in his back, but was non-tender over the tailbone. (*Id.*) Dr. Sauvey ordered x-rays, including tailbone views, to define his injury more carefully if possible. (*Id.*) She also added a lumbar role for comfort while sleeping to assist Blue in pain management. (*Id.*)

Blue was scheduled for x-rays on November 21, 2013, but refused the appointment so he could go to the barber. (*Id.* ¶ 72.)

Blue went through with an x-ray appointment on December 12, 2013. (*Id.* ¶¶ 74.) Those x-rays showed that Blue had a normal tailbone, no acute injury, an L4 compression fracture that was questionably old, and Grade 1 degenerative joint disease in both hips. (*Id.* ¶¶ 74-76, 80.)

On January 15, 2014, Dr. Sauvey saw Blue to recheck his tailbone pain. (*Id.* ¶ 80.) He was observed sitting and standing and appeared comfortable. (*Id.*) He had a normal gait. (*Id.*) On exam there was no evidence of: spinal cord injury, muscle atrophy from injury to nerves or spine, irritation of the sciatic nerve, or rectal masses. (*Id.*) Dr. Sauvey also reviewed Blue's x-rays from December. (*Id.*) She assessed tailbone pain, etiology unclear, possible left sided sciatica, and early degenerative joint disease in both hips. (*Id.*) She ordered PSA, hemocult and alkaline phosphate testing; added flexeril at night; and made a plan to recheck after testing. (*Id.*)

- 13 -

On February 14, 2014, Dr. Sauvey saw Blue again for complaints of mid to low back pain. (*Id.* ¶ 82.) He complained he was unable to walk straight or sit comfortably, but continued to work and lift garbage bags. (*Id.*) He appeared in some distress, and was flexed twenty-five degrees forward. (*Id.*) It appeared he had muscle spasms or cramping in his low back from bending forward. (*Id.*) Dr. Sauvey recommended that he use ice, bed rest, a back binder, and pain medication to treat the issue. (*Id.*) She also ordered six sessions of physical therapy. (*Id.*)

Blue completed physical therapy in February and March, including instruction on a home exercise program, and reported that he was doing "a lot lot better." (*Id.* ¶¶ 83-86.)

On April 7, 2014, Blue was seen by the advanced practice nurse practitioner. (*Id.* ¶ 88.) At the appointment, he indicated that he was without complaints, and it was noted that he came from recreation where he had played basketball. (*Id.*)

On April 14, 2014, Dr. Sauvey saw Blue to follow-up on his tailbone pain. (*Id.* ¶ 89.) He continued to complain of pain and stated that medications and the donut relieve pain temporarily. (*Id.*) Dr. Sauvey noted that Blue was able to recreate by playing basketball approximately two times a week. (*Id.*) She made a plan to refer him to an outside

- 14 -

orthopedics visit to discuss his tailbone pain. (*Id.*)

DOC policy governs how practitioners obtain approval to refer inmates offsite for non-emergent care. (*Id.* ¶ 90.) If the physician determines that an inmate has a medical issue that would require him to go off-site to see a specialist, the physician will submit a Class III request to the Bureau of Health Services. (*Id.*) Those requests are reviewed by the Bureau of Health Services medical director, who either approves or denies the request. (*Id.* ¶ 91.)

On April 14, 2014, Dr. Sauvey completed and submitted a Class III request for Blue to be seen by an orthopedic specialist for his tailbone issue. (*Id.* ¶ 92.) Dr. Sauvey's Class III referral for Blue was denied by medical director Dr. Holzmacher on April 15, 2014. (*Id.* ¶ 93.) In denying the request, Dr. Holzmacher indicated that Blue should be sent to interventional pain management for ganglion impar block instead. (*Id.*) That is where the nerve root is injected with anesthetic plus a cortisone product for control of pain and inflammation. (*Id.*) Subsequently, Dr. Sauvey ordered Blue to see an interventional pain specialist (Advanced Pain Management) for evaluation and epidural block, if approved. (*Id.* ¶ 94.)

Dr. Sauvey does not schedule medical appointments or follow-up

- 15 -

appointments for inmates with off-site treatment providers. (*Id.* ¶ 95.) GBCI nursing staff works with off-site providers to schedule appointments. (*Id.*) DOC does not have authority to direct off-site providers to see an inmate on a certain date. (*Id.*)

On May 28, 2014, Blue was seen by Dr. Patel at Advanced Pain Management in Green Bay, Wisconsin. (*Id.* ¶ 100.) When he returned to the institution, he was seen by a nurse in segregation. (*Id.*) Per Blue's report, he was to be scheduled for back injections and to see the doctor in one month. (*Id.*) Dr. Patel listed a primary diagnosis of lumbar radiculopathy and coccydynia. (*Id.*) He recommended exercises, epidural steroids, and outpatient visit follow-up in one month. (*Id.*)

On May 29, 2014, Dr. Sauvey ordered a recheck with Advanced Pain Management in two weeks followed by a second visit one month after that, per their recommendations. (*Id.* ¶ 102.) On June 18, 2014, Sauvey wrote another order instructing that an appointment be scheduled for Blue with Advanced Pain Management clinic for an epidural injection. (*Id.* ¶ 106.) Dr. Sauvey does not know why Blue was not scheduled to be seen at the Advance Pain Clinic within two weeks as she ordered on May 29, 2014. (*Id.*) She does not schedule follow-up appointments for inmates with off-site treatment providers. (*Id.*) That task is handled by GBCI nursing staff at

- 16 -

the convenience and availability of the off-site provider. (*Id.*)

On July 28, 2014, Blue was seen at Advanced Pain Management for his first epidural injection for chronic lumbosacral musculoskeletal pain. (*Id.* ¶ 113.) Recommendations following the visit included an office visit with Gerald Gozner, PAC, at Advanced Pain Management in two months. (*Id.*) Subsequently, Dr. Sauvey ordered that Blue be rescheduled to see Advanced Pain Management in two months, which was done on September 17, 2014. (*Id.* ¶¶ 114, 117.)

Between August 6, 2013 and December 1, 2014, Blue was seen at least 32 times by HSU staff for his chronic low back pain. (*Id.* ¶ 141.) Between September 5, 2013 and December 1, 2014, Dr. Sauvey saw Blue over ten times for his complaints of chronic low back pain. (*Id.* ¶ 142.) In addition, he received specialty care with office visits and repeated diagnostic and therapeutic procedures, and continued in their management through May 29, 2015. (*Id.*)

## DISCUSSION

The defendants contend that Francois, Baenen, and Pusich are not responsible for Blue's alleged fall and lack personal involvement in Blue's constitutional claim related to the fall. The defendants also contend that Blue's claim that he was denied a chair to get down from his bunk does not

- 17 -

state a conditions of confinement claim. According to the defendants, the broken chair in Blue's cell was not an objectively serious deprivation and the defendants were not deliberately indifferent to Blue's complaints about the chair in his cell. The defendants further contend that Dr. Sauvey was not deliberately indifferent to Blue's medical needs. Lastly, the defendants contend that they are entitled to qualified immunity.

In response, Blue contends Francois, Baenen, and Pusich are liable for his conditions of confinement claim. According to Blue:

> Prior to me falling I informed cell hall staff, staff instructed me to file an inmate complaint if I needed a sturdy chair, I did file the inmate complaint and Francois and Warden Baenen dismissed my complaint, knowing I could fall and hurt myself. Francois and Warden Baenen, ignored that fact, and instructed me to contact Captain Pusich. Francois or Warden Baenen could of made a phone call to the cell hall and had the damaged chair removed from my cell, which would of prevented me from falling injuring myself, after Francois and Warden Baenen was made aware of the damage chair, they disregarded my safety, and when I contacted Captain Pusich and made her aware of the damaged chair in my cell, letting her know I was instructed to contact her by Francois, Captain Pusich disregarded my safety and told me chairs are limited, deal with cell hall staff, for me I was back where I started, Francois, Warden Baenen, and Captain Pusich, knew very well the chair in my cell posed a risk to my safety, which makes them responsible.

(ECF No. 80 at 2.) Blue states that the defendants "knew prior to me falling I was in an excessive risk to my safety, and they disregarded doing

- 18 -

something to correct/fix it, replacing the chair in my cell would of prevented me from falling hurting myself." (ECF No. 80 at 3.) He further states that: "The defendants admit there's no official procedure of how an inmate climb in and out of the top bunk, from observation everyone I see use the chair, the desk, the sink to climb in and out of the top bunk, none of those is providing a safe environment for inmate housed at GBCI that clearly violates inmates' constitutional rights." (ECF No. 80 at 3.)

With regard to his medical care claim, Blue contends that Dr. Sauvey ignored and delayed his medical treatment on many occasions. Blue asserts that "those actions prevented me from getting the proper treatment I needed to eliminate more pain in the future, by Sauvey ignoring my medical need has caused me to suffer longer." (*Id.*)

A.    **Conditions of Confinement Claim**

Two requirements must be met to sustain a § 1983 conditions of confinement claim. First, the alleged violation must be "sufficiently serious"; that is, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Stated another way, to rise to the level of an Eighth Amendment violation, prison conditions must be so serious as to deprive an inmate "of the minimal civilized measure of life's necessities."

*Id.*  Second, the inmate must show that the defendants acted with deliberate indifference to that risk.  *Id.* at 834, 837.  To satisfy this subjective prong, Blue must show that the defendants knew of and disregarded an excessive risk to his health or safety.  *Id.* at 837.  In other words, the prison officials "must both be aware of facts from which the inference could be drawn that a substantial risk of the harm exists, and [they] must also draw the inference."  *Id.*

In *Withers v. Wexford Health Servs.*, 710 F.3d 688 (7th Cir. 2013), the court of appeal considered an inmate's Eighth Amendment deliberate indifference to a serious medical need claim based on his allegations that, among other things, prison officials refused his repeated requests for a lower bunk.  The inmate allegedly suffered from scoliosis and frequent flare-ups of back pain.  *Id.* at 689.  The court held that there was a genuine issue a material fact as to whether a nurse was deliberately indifferent to the inmate's medical needs when she allegedly left the prisoner to climb a ladderless bunk bed.  *Id.* at 691.  The court described the interaction as follows:

> There is, however, one troubling feature of the case.  It involves an encounter that the plaintiff had with a registered nurse named Debra Miller, one of the defendants.  The plaintiff alleges that one night, because of back pain that he was experiencing, he asked her to let him stay overnight in

- 20 -

the prison's Health Care Unit. He says that she refused and wheeled him back to his cell in a wheelchair; that he told her he wouldn't be able to climb into his bunk (the upper one) and she replied "when you get tired you'll figure it out," and left him; that because of his back pain he fell trying to climb into the upper bunk – there was no ladder – and as a result was injured. If this narrative is true, it is evidence of deliberate indifference to an imminent danger of injury to a prisoner and gives him a valid claim to relief under section 1983. *Murphy v. Walker*, 51 F.3d 714, 719 (7th Cir. 1995) (per curiam); *United States v. Gonzales*, 436 F.3d 560, 574 (5th Cir. 2006); *cf. Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002).

The evidence may be false, though we note that, judging from recent cases, absence of ladders is a common feature of prison bunk beds. *See Robinett v. Correctional Training Facility*, No. C 09-3845 SI, 2010 WL 2867696, at *2 (N.D. Cal. July 20, 2010); *Brown v. Anderson*, No. 6:09-2632-JFA-WMC, 2010 WL 199692, at *2 (D.S.C. Jan. 13, 2010); *Jones v. Louisiana Dept. of Public Safety & Corrections*, No. 08-cv-1507, 2009 WL 1310940, at *2 (W.D. La. May 11, 2009); *Connolly v. County of Suffolk*, 533 F. Supp. 2d 236, 241 (D. Mass. 2008).

. . .

Even if all the plaintiff's allegations are true, however, they don't make a conclusive case of deliberate indifference. The nurse may, in light of the plaintiff's record of malingering, have believed that he would have no difficulty climbing to the upper bunk, or at least that he would not fall and hurt himself. She may have believed that he was just trying to lie his way into a more comfortable bed in the Health Care Unit. *See Ramos v. Patnaude*, 640 F.3d 485, 490 (1st Cir. 2011); *Weaver v. Shadoan*, 340 F.3d 398, 412 (6th Cir. 2003). But as yet his version of the incident stands unrebutted.

. . .

- 21 -

The nurse knew that the plaintiff had scoliosis and intermittent back pain and may also have known that a deformity of the spine can make it difficult, whether because of scoliosis-related back pain or some other consequence of that condition, for a sufferer from scoliosis to climb to an upper bunk safely without using a ladder. We are mindful that there is "another way people get up to the top bunk (especially teenagers)" – "by stepping onto the bottom bunk, and then either climbing or jumping up to the top bunk." WikiHow—To Do Anything, "How to Get Up to the Top Bunk of a Bunk Bed," www.wikihow.com/Get-Up-to-the-Top-Bunk-of-a-Bunk-Bed (visited Feb. 17, 2013). But "you need to have fairly good upper-body strength for this though." *Id.* It may not have been a feasible alternative to a ladder for this plaintiff, given his condition.

*Id.* at 689-90.

This case is distinguishable from *Withers*. In this case, Blue did not link his requests for a sturdy chair to any medical condition. He said he needed the chair to get into and out of his upper bunk, yet the chair was broken. He explained that this was a "dangerous situation" and that the bunks need a ladder of some type. This is not a case where Blue said he needed a lower bunk for medical reasons, or needed a way to access the upper bunk for medical reasons, as in *Withers*.[2] Indeed, while Blue acknowledges that he had back pain predating his fall on August 6, 2013, he also states that at the time before he fell off the damaged chair, he "was

_____

[2] Blue did request a lower bunk restriction in 2010 but medical staff determined that he did not qualify for the restriction because he was able to play basketball and lift weights.

- 22 -

in no back pain" and that the fall caused a new injury.  (ECF No. 81 ¶ 49.)

Blue does not explain why he continued to use a damaged chair to get down from the upper bunk.  He suggests that there were no alternatives because "never does an inmate use the lower bunk frame to climb in and out of the top bunk, as an inmate code of honor, at no time do you put your feet on the lower bunk because you will stepping on the inmate that sleep[s] on the bottom bunk mattress[.]"  (ECF No. 80 at 5.) Blue also states using the chair, sink, or desk is not a safe way to access the top bunk.  Blue submitted affidavits from three inmates who aver that accessing the upper bunk without a ladder is dangerous.  (ECF No. 82, 83, 84.)  Inmate Bonilla avers that he only uses the chair to get in the top bunk, "the sink and the desk were too risky, and no one dare step on the bottom guy bunk to climb into the top bunk."  (ECF No. 82 at 1.)

Blue's claim boils down to the fact that GBCI does not have ladders to access the top bunk.  Courts have uniformly held that the lack of a ladder to reach an upper bunk does not pose a serious risk of harm. *Connolly v. County of Suffolk*, 533 F. Supp. 2d 236, 241 (D. Mass. 2008) (failure to provide ladders for prison bunk beds did not constitute "deliberate indifference" to rights of inmate who fell while attempting to climb to his third tier bed; county officials affirmatively weighed the

- 23 -

benefits of equipping prison bunk beds with ladders against a perceived risk that the ladders could be converted into weapons or facilitate inmate suicides); *Robinett v. Corr. Training Facility*, 2010 WL 2867696, at *2 (N.D. Cal. July 20, 2010) (concluding on § 1915A review that a failure to provide a ladder to top bunk inmates does not satisfy objective or subjective prongs of an Eighth Amendment claim); *Brown v. Anderson*, 2010 WL 199692, at *2 (D. S.C. Jan.13, 2010) (finding no § 1983 deliberate indifference cause of action for a claim that defendants failed to provide a safe way for plaintiff to get into six-feet high upper bunk); *Jones v. La. Dep't of Pub. Safety and Corr.*, 2009 WL 1310940, *2 (W.D. La. May 11, 2009) (dismissing on § 1915A review a claim for a prisoner injured when his foot slipped on cell bars he had to climb to reach his upper bunk due to there being no ladder because such a condition did not satisfy objective prong of Eighth Amendment test); *Williams v. Corizon*, Civ. A. No. 122412, 2013 WL 4787223, at *15 (E.D. Pa. Sept. 9, 2013) ("To the extent that Plaintiff attempts to argue that Defendant City of Philadelphia is liable because they did not have ladders for all the bunk beds, such argument fails, since that is, at most, negligence, which does not demonstrate the requisite culpability for liability to attach."); *Franco-Calzada v. United States*, 375 F. App'x 217, 218-19 (3d Cir. 2010) (per curiam) (dismissing appeal as

- 24 -

frivolous when plaintiff's constitutional claims rested on allegations that he fell from a faulty ladder attached to his top bunk, which defendants knew or should have known to be unsafe because at least two other inmates had fallen); *Wiseman v. Cate*, No. 1:10-cv-00024-OWW-SMS, 2011 WL 846208, at *2 (E.D. Cal. March 4, 2011) ("The failure to provide bunk ladders is simply not a condition so grave that it deprives Plaintiff of the minimal civilized measure of life's necessities."); *McDaniel v. Walsh*, No. 09-2170, 2011 WL 489787, at *5 (C.D. Ill. Feb. 7, 2011) ("A ladder to the upper/top bunk is not one of life's necessities and therefore Plaintiff fails to satisfy the objective component applicable to his claim. Inmates and pretrial detainees are not constitutionally guaranteed a ladder to an upper bunk."); *Millsap v. Cate*, No. 2:10-cv-02008-MCE-EFB, 2012 WL 1037949 (E.D. Cal. March 27, 2012) (a prisoner who alleged that the stool he was standing on when he was trying to ascend to the upper bunk collapsed while he was standing on it and, as a result, fell to the floor and injured himself, and who also alleged that prison officials had been made aware of the unsafe conditions, failed to state a claim under the objective prong of the Eighth Amendment test); *Leggaro v. Tact*, 10-C-50243, 2010 WL 5135910 (N.D. Ill. Dec. 9, 2010) (inmate's allegations about the lack of ladders for inmates with upper bunks at the Winnebago County Jail does not state a

sufficiently serious jail condition to support a § 1983 claim). These cases demonstrate that the conditions that Blue was subjected to – an upper bunk assignment with a broken chair and no ladder – was not sufficiently serious to raise Eighth Amendment concerns.

In addition, Blue has not shown that Francois, Baenen, or Pusich acted with deliberate indifference. They believed that inmates could get up and down from the top bunk without difficulty using the bunk frame. Thus, the fact that Blue's chair was not sturdy would not have led them to believe that Blue was in a dangerous situation. Moreover, the record reveals that Francois, Baenen, and Pusich addressed Blue's complaints. They also advised him to contact the HSU if he had a medical concern about accessing the top bunk, and Blue does not allege that he did that. The facts do not support a finding that the defendants acted with deliberate indifference. *See Withers*, 710 F.3d at 690. Accordingly, the Court will grant the defendants' motion for summary judgment as to Blue's conditions of confinement claim.

## B. Medical Care Claim

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750

(7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009); *see also, Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104). Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *Arnett*, 658 F.3d at 750 (citation omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 104).

A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Roe*, 631 F.3d at 857 (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

- 27 -

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Roe*, 631 F.3d at 857. "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" *Arnett*, 658 F.3d at 759 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). It is not medical malpractice; "the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (citation omitted).

"A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 759 (quoting *Duckworth*, 532 F.3d at 679). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857 (quotation marks omitted). However, a prisoner "need not prove that the prison officials

- 28 -

intended, hoped for, or desired the harm that transpired." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). "Nor does a prisoner need to show that he was literally ignored." *Arnett*, 658 F.3d at 759 (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Arnett*, 658 F.3d at 759 (quoting *Greeno*, 414 F.3d at 653). However, deliberate indifference is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it. *Walker*, 293 F.3d at 1037.

Far from demonstrating deliberate indifference, the undisputed facts reveal that Dr. Sauvey provided extensive medical care to Blue for his back pain. The record does not support a finding that the treatment was unreasonable or a departure from professional standards. Moreover, to the extent that Blue faced a delay in returning to Advanced Pain Management for an epidural injection, Dr. Sauvey was not responsible for the delay. A reasonable factfinder could not conclude that Dr. Sauvey acted with deliberate indifference to Blue's medical needs. Accordingly, the Court will grant summary judgment as to the medical care claim.

## ORDER

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT the defendants' motion for summary judgment (ECF No. 57) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 20th day of May, 2016.

BY THE COURT:

HON. RUDOLPH T. RANDA
U.S. District Judge

- 30 -